## WALTER S. NEWHALL CO. v. BALTIMORE & O. R. CO.

(District Court, D. Maryland. June 23, 1917.)

PATENTS ☞328—VALIDITY AND INFRINGEMENT—APPARATUS FOR THAWING MATERIAL IN FREIGHT CARS.

> Patent No. 1,044,230, for apparatus for thawing material in freight cars, covers means for thawing coal which has become wet and frozen in the cars, so that it may be readily unloaded when the cars are lifted and dumped, as is usual at large coal terminals. Such apparatus consists generally of a long train shed having one or more tracks provided with doors for closing the ends and having a blower house overhead, where air is heated and blown through pipes or ducts under and around the cars and then sucked back to be reheated and used over. *Held*, that the patent was not anticipated, but covers an invention of a pioneer character, and is entitled to a liberal construction and a broad range of equivalents. Claims 20 and 23 also *held* infringed, and claims 7 and 11 not infringed.

In Equity. Suit by the Walter S. Newhall Company against the Baltimore & Ohio Railroad Company. On final hearing. Decree for complainant.

Bates & Macklin, of Cleveland, Ohio, Edwin F. Samuels, of Baltimore, Md., and Robert M. Morgan and Albert H. Bates, both of Cleveland, Ohio, for plaintiff.

Duncan K. Brent, of Baltimore, Md., and Otto Moat, for defendant.

ROSE, District Judge. The plaintiffs are the owners of letters patent No. 1,044,230, issued to them November 12, 1912, for an apparatus for thawing material in freight cars. They say the defendant, the Baltimore & Ohio Railroad Company, has infringed.

The quickest way to unload a car of coal or similar material is to lift the car up and turn it over. It is the cheapest, also, where the volume of traffic to be handled is large enough to justify the expense of installing the necessary machinery. It has at least one drawback. The coal may be damp or wet. In cold weather it will freeze. When freezing, it adheres firmly to the bottom and sides of the car. Various devices for loosening it have been used. Gangs of laborers have jammed the car sides with heavy poles or beams. They break the ice, but they hurt the car. There was another method not quite so crude. Points were put on the lower ends of pieces of gas pipe. These pipes at the other end were connected with steam hose. The points of the pipes were forced down into the coal and the steam turned on. The weather being cold, the steam condensed rapidly, it froze on the cars, wheels, tracks, platforms, ship's decks, etc. The laborers employed found the work unpleasant, and occasionally, from bursting pipes, somewhat dangerous.

The plaintiffs were in the employ of a company in the business of unloading coal at a South Amboy terminal of the Pennsylvania Railroad Company. They set out to find some better way of thawing coal. One scheme after another which occurred to them was tried and abandoned. They finally hit on that embodied in the patent in suit. At a cost of $50,000 necessary apparatus was installed at South

Amboy in 1911. It has been used there ever since. Nearly 2,700,000 tons of coal have been thawed by its use, at an average cost of about 1⅓ cents a ton as compared with the previous cost of 4 cents. The work has been done with very much less damage to the cars and equipment and very much more comfort to every one concerned. Another and larger plant of the same kind has recently been installed at South Amboy, and a third at Greenwich Point, near Philadelphia. All of them are doing good work.

Reduced to its simplest form, the apparatus consists of a long train shed capable of housing a number of cars. It is provided with doors by which its ends can be closed. On top of it there is a blower house, in which air is heated and while hot blown or driven through appropriately arranged ducts and conveniently placed openings in them, so that it is thrown upon the bottom and sides of the cars to be thawed. The air is then sucked back, to be again heated and again driven through the shed. In the patented device the shed has a ceiling, and a roof above the ceiling. The space between the two is used for the air ducts to and from the heater and blower system. It is divided into three longitudinal flues by means of two vertical partitions. Each partition, together with the wall next to it, forms the duct through which the hot air is driven through the heater and in the blower into the shed for distribution to the cars. The space between the two partitions forms the duct through which the air, which has been used, and to a degree cooled, is sucked back into the heater and blower. From the hot-air ducts descend a number of discharge ducts, located in the inner facings of the shed walls. These vertical flues are open at their lower portions toward the track end. The heated air is forced through the horizontal ducts and down through the various vertical ducts, and is discharged at the track level, where it passes under and around the cars and, rising upwards, is drawn into the central duct through openings therein. It is then sucked back through the central duct directly into the blower room. It is then again heated, and is forced out once more into the shed, and in this manner is kept in constant circulation. The shed is made wide enough to cover the number of tracks it is desired to use in connection with the thawing plant. When it is built for more than one track, it is divided by substantial partitions into as many compartments as there are tracks. The preferred and usual form of construction covers two tracks, and quite a number of the claims of the patent in suit are limited to a two-track structure.

The evidence leaves no question that the plaintiffs were the first who ever thawed cars or their contents by such a system. Early in 1914 the defendant needed greater coal pier facilities at Curtis Bay. It thought it might be desirable to install machinery by which the cars could be lifted and dumped. If that was done, a thawing plant would be required. The defendant entered into correspondence with the plaintiffs. Various interviews took place between them and its officials. The war came on, and nothing more was done until the end of August, 1915. Then the interviews and correspondence began anew. Plans and photographs of plaintiffs' device were submitted to

defendant's engineers. They were invited to bid for the erection of the plant. They did so. Apparently defendant regarded their price as too high, and it arranged with the Surety Engineering Company for the installation of a similar plant. The latter gave bond to protect the defendant against the consequences of an infringement of plaintiffs' patent, and has through its counsel conducted the defense in this case.

What the defendant wanted was a plant as near like plaintiffs' as it could get, without paying plaintiffs for it. The Engineering Company took plaintiffs' patent and set out to make a device which would work like plaintiffs', but upon which plaintiffs' claims could not be read. This was a somewhat difficult task, because the plaintiffs are the pioneer inventors and entitled to a broad construction of their claims. The defendant has set up many patented devices in the prior art. It is significant that not one of them was for a thawing plant. All or nearly all of them were for drying fruit, bricks or lumber. The conditions under which such processes are carried on are unlike those necessary in a thawing apparatus. No one of them ever suggested anything to the plaintiffs, to defendant, or anybody else who was seeking to solve this thawing problem. It is in evidence that as early as 1908 the American Blower Company described in its catalogue a means for heating and ventilating roundhouses. One of the advantages claimed for this device was that the warm, dry air discharged in the pits under the locomotives quickly removed the ice and snow from the latter, leaving them thoroughly dry. The conditions to be dealt with, however, were quite different from those involved in the thawing of trains, and the disclosures then made fall far short of anticipating plaintiffs' device. For some years an effective thawing apparatus had been desired by railroad companies. These had at their command large capital and the best engineering and mechanical brains of the country. When the defendant wanted a thawing plant, its mind turned to plaintiffs' apparatus, and not to any existing form of heating roundhouses or to any drying device, whether in use or embalmed in the Patent Office morgue. It saw that the plaintiffs had made the location and construction of their hot-air and return ducts or flues elements of many of their claims, and it sought to escape these by the obvious expedient of arranging these ducts somewhat differently. It carries downward directly from the blower house the entire supply of hot air intended for one shed to flues running through the shed, and along the shed walls on or near the track level. At convenient intervals it supplies openings through which the air is forced out to the cars. The blower rooms are similarly located in each structure. The hot air is discharged at the same points. In each it is carried to the place of use by flues or ducts. They are unlike only in the circumstance that in plaintiffs' the flues are first horizontal and then vertical, while in defendant's the opposite is true. The difference between the means used for returning the air to the blower room are as unsubstantial. Defendant does not provide a return duct running the length of the train shed. Through an opening connecting the upper portion of the shed with its heating

and blowing apparatus it sucks back the air. From other of plaintiffs' claims defendant has sought to escape by equally unessential changes in the arrangement of its heaters and blowers and of their connections with the train shed. In all this it has been so successful that plaintiffs have been able to claim infringement of but 4 of their 23 claims, viz. Nos. 7, 11, 20, and 23.

The elements of claim No. 20 are: (1) Two train sheds side by side. (2) Individual hot-air and return ducts for each shed. (3) A blowing apparatus connected with the ducts of both sheds. (4) Dampers adapted to restrict the action of such apparatus to either shed. Defendant says that it does not use the third and fourth of these, but its expert admits that it has dampers by the operation of which one of its heating and blowing units can, in an emergency, be used, though less efficiently, in the other stall. This quite satisfies plaintiffs' claim.

The elements of claim No. 23 are: (1) A train shed. (2) A blower room located at an intermediate point at the top of the train shed. (3) A pair of blowers in said blower room discharging in opposite directions. (4) Means for conducting air from such blowers through the train shed and returning it to the blower. (5) Means for heating such air. Defendant asserts that its apparatus does not contain the third element, in that its pair of blowers do not discharge in opposite directions. This contention can be sustained only by an unjustifiably narrow construction of the claim.

Plaintiffs' seventh claim is for a combination made up of the following elements: (1) A long narrow compartment having a trackway adapted to inclose several cars. (2) Closures for the ends of the compartments. (3) Air ducts located in the upper part of the compartments adjacent to the roof. (4) Down-take flues connected with those of the ducts which are for hot air, said flues being open on the inner sides near the bottoms. (5) Return duct, located adjacent to the roof and communicating with the upper portion of the room. (6) A blower and casing adapted to receive air from the return flue and force it across a heater into the hot-air ducts. (7) Means for controlling the admission of fresh air. The last of these defendant says it has not, but the doors and windows in its blower house serve the purpose sufficiently well. I am, however, reluctantly constrained to agree with defendant that the third and fourth elements are limited to the specific construction of air ducts, shown in plaintiffs' patent. If so, this seventh claim cannot be read upon the defendant's structure, nor for a like reason can the eleventh.

It follows that the four claims in suit are valid, but that defendant does not infringe either 7 or 11, but does infringe 20 and 23. A decree in accordance with this conclusion may be drafted.